# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5794 | **DATE** | 4/25/2003 |
| **CASE TITLE** | Pulphus, et al vs. Sullivan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER: The bank defendants' motions to dismiss are granted in part and denied in part.  Plaintiffs have twenty-one days from the date of this Memorandum Opinion and Order to amend their complaint.  Any claims not amended within that period will be dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| ✓ | Copy to judge/magistrate judge. |

number of notices

APR 2 8 2003
date docketed

docketing deputy initials

APR 2 8 2003
date mailed notice

**Document Number**

44

TBK

courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

DOCKETED

APR 2 8 2003

| | | |
|---|---|---|
| MATILDA PULPHUS, BARBARA VANZANT, SYLVIA MANDERSON and STEPHANIE BARNAS, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 02 C 5794 Paul E. Plunkett, Senior Judge |
| JOHN J. SULLIVAN, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have sued defendants for their alleged violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., and state law. Defendants Equicredit Corporation of America ("Equicredit"), Fairbanks Capital Corporation ("Fairbanks"), Bank One, Citizens Bank ("Citizens") and the Provident Bank d/b/a PCFS Financial Services, Inc. ("Provident") have filed motions to dismiss the claims asserted against them pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons set forth below, the motions are granted in part and denied in part.

## Facts

### The Parties

Plaintiffs Matilda Pulphus, Barbara Vanzant, Sylvia Manderson and Stephanie Barnas are elderly homeowners and unsophisticated consumers who are unfamiliar with the details of modern

44

mortgage transactions. (Compl. ¶¶ 4-7.) Defendant Sullivan operates New Look Home Services, an Illinois company ostensibly engaged in the business of providing home improvement services. (Id. ¶¶ 8-9.) Defendant MDR Mortgage is an Illinois corporation that provides mortgage brokerage services. (Id. ¶ 11.) Defendant Gold is a mortgage broker employed by MDR Mortgage. (Id. ¶ 10.) Defendant Heritage Title Company is an Illinois corporation doing business as a real estate title company. (Id. ¶ 13.) Defendant Alfaro-Giler is a mortgage loan closer employed by Heritage Title. (Id. ¶ 12.) Defendant Hartford Financial Services is an Illinois corporation doing business as a mortgage broker and lender. (Id. ¶ 14.) Defendant Citizens is a Tennessee banking corporation that does business in Illinois as a residential mortgage lender. (Id. ¶ 15.) Defendant Bank One is a national banking corporation that does business in Illinois. (Id. ¶ 16.) Defendant Equicredit is a Delaware corporation that does business in Illinois as a residential mortgage lender or servicer. (Id. ¶ 17.) Defendant Fairbanks is a Utah corporation doing business in Illinois as a residential mortgage lender or servicer. (Id. ¶ 18.) Defendant Provident is an Ohio bank that does business in Illinois as a residential mortgage lender or servicer. (Id. ¶ 19.)


**Scheme to Defraud Pulphus**

In the fall of 1999, Pulphus applied for a grant to CEDA, a governmentally-funded program that provides assistance to those who need help paying their utility bills. (Id. ¶ 20.) Shortly thereafter, defendant Sullivan contacted her, told her he was from CEDA and offered to do some home repair work through the Weatherization Program. (Id. ¶ 21.) Having received an energy-efficient furnace through the Weatherization Program some years before, Pulphus believed Sullivan's claims. (Id. ¶¶ 22-23.)

When Sullivan came to Pulphus' home, he offered to do a variety of work, including installing new windows, a new back porch and a roof. (Id. ¶ 24.) Sullivan did not quote a price for the work and did not give Pulphus a written contract. (Id. ¶ 25.) He did, however, agree to do work only when Pulphus was present. (Id. ¶ 26.)

A few days later, Pulphus returned home from an appointment to find that Sullivan had removed her back porch. (Id. ¶ 27.) Subsequently, Sullivan and defendants Gold and Alfaro-Giler gave Pulphus a number of documents to sign, which they said were related to the Weatherization Program. (Id. ¶ 28.) Pulphus, who has only a third-grade education, was unable to read or understand the documents, but signed them because she thought that was the only way she would get her porch replaced. (Id. ¶¶ 29-30.) The documents created a mortgage in favor of defendant Citizens in the amount of $71,000.00 with an annual interest rate of 10.722%. (Id. ¶ 31.)

Among the documents were two conflicting Truth in Lending disclosures and a post-dated confirmation that Pulphus was not exercising her three-day right to cancel the transaction. (Id. ¶¶ 32-33.) Missing from the documents, however, was a HUD-1 Settlement Statement setting forth the charges and disbursements of the loan proceeds. (Id. ¶ 34.)

Of the $71,000.00 loan proceeds, $27,000.00 went to the bank that held the first mortgage on Pulphus' home. (Id. ¶ 37.) The rest went to defendants Sullivan and Gold. (Id. ¶¶ 35-36.) The maximum value of the work Sullivan performed on Pulphus' home was $6,000.00. (Id. ¶ 39.)

Immediately after the transaction, Citizens assigned the mortgage and note to defendant Bank One. (Id. ¶ 43.) Pulphus has made monthly payments to Bank One. (Id. ¶ 44.)

## Scheme to Defraud Vanzant

In October 2000, Vanzant hired New Look to make small improvements to her home at a cost of $2,916.00. (Id. ¶ 46.) In December 2000, Sullivan convinced Vanzant to do substantial improvements to her home. (Id. ¶ 47.) He did not give her a written proposal, contract or price for the job, but told her he could arrange for a mortgage to finance the project and for special insurance that would pay off the mortgage in the event of her death. (Id. ¶¶ 48-50.)

On January 12, 2001, Gold, who Vanzant understood to be an employee of New Look, took her to an office on the north side of Chicago, where she signed the mortgage documents. (Id. ¶¶ 52-53.) Because Sullivan asked Vanzant to give him the loan documents shortly after the transaction was consummated, it is not clear whether Vanzant received copies of all of the documents at the closing. (Id. ¶ 56.) When he returned the documents to her, however, neither the note nor the HUD-1 Settlement Statement was included. (Id. ¶ 58.)

The documents created a mortgage in favor of defendant Hartford in the amount of $50,000.00 with an annual interest rate of 12.01%. (Id. ¶¶ 59, 62.) Vanzant received $4,200.00 of that amount with the rest going to defendants New Look and MDR Mortgage. (Id. ¶¶ 59-60.) On February 6, 2001, Hartford assigned the loan to defendant Equicredit. (Id. ¶ 65.)

New Look started some of the work, but did not complete it. (Id. ¶¶ 57, 68.) When Vanzant complained, Sullivan told her she would have to "re-do" the mortgage to complete the work. (Id. ¶ 69.) As compensation for the delay in the work, however, Sullivan said that New Look would give her "8 months of payments" on the second mortgage and that the loan would include "(1) garage to be built; (2) fence in front and side; (3) cement additional work where needed; (4) any electric needed." (Id.)

On March 27, 2001, Vanzant executed another set of mortgage documents. (Id. ¶ 72.) These documents created a mortgage in favor of Hartford in the amount of $80,000.00, with an adjustable interest rate of between 7.5% and 14.75%. (Id. ¶ 73.) Of that amount, $50,305.00 went to Equicredit to pay off the note Vanzant had signed less than three months earlier, $28,742.31 went to defendants Sullivan, Gold, Alfaro-Giler and/or New Look, MDR Mortgage, Hartford and Heritage Title. (Id. ¶¶ 76, 78.) The remaining $952.69 went to Vanzant. (Id. ¶ 77.)

On April 10, 2001, Hartford assigned the loan to Equicredit. (Id. ¶ 83.) On April 1, 2002, Equicredit assigned the loan to defendant Fairbanks. (Id. ¶ 84.) Vanzant has made monthly payments to Equicredit and Fairbanks. (Id. ¶ 85.)

New Look never completed the work, and what little was done was done poorly. (Id. ¶¶ 57, 80.) After Vanzant complained to the authorities, Sullivan produced copies of two contracts and a release on which Vanzant's signature had been forged. (Id. ¶¶ 86-87.)


### Scheme to Defraud Manderson

In February 2000, Sullivan gave Manderson an estimate of $350.00 to replace a leaky pipe, rod out her pipes and clean her catch basin. (Id. ¶¶ 89-90.) At Sullivan's request, Manderson showed him her mortgage documents, which disclosed a first lien in favor of Capital One for $62,000.00 and a second lien in favor of Conti Mortgage for $8,100.00. (Id. ¶¶ 88, 91.) He told her that he could get someone to refinance her mortgage at a lower interest rate. (Id. ¶ 92.)

A few days later, Gold gave a number of documents, without any numbers on them, to Manderson and her daughter to sign. (Id. ¶ 93.) He told them they were loan application documents, which had to be completed before any work could be done on Manderson's home. (Id. ¶¶ 94-96.)

Gold did not give copies of the documents to Manderson. (Id. ¶ 93.) In reality, the documents created a mortgage in favor of Hartford in the amount of $80,000 with a variable interest rate of between 12.0% and 19.0%. (Id. ¶ 102.)

Sometime later, Gold appeared at Manderson's home with a check for $1,799.00, which he told her to cash immediately. (Id. ¶ 97.) Gold gave her some, but not all, of the documents she had previously signed. (Id. ¶¶ 98-100.) When she complained, he mailed her some additional documents. (Id. ¶¶ 100-01.)

Before she received those documents in the mail, two workmen appeared at Manderson's home asking her to sign a contract to pay $1,000.00 to have her leaky pipe fixed. (Id. ¶ 103.) When she said Sullivan's estimate had been $350.00, the workmen called Sullivan who said the job would cost $1,000.00. (Id. ¶ 104.) Manderson signed the contract, but was not given a copy of it. (Id. ¶ 105.) In return, New Look did nothing more than put a patch on the leaky pipe. (Id. ¶ 106.) After Manderson's repeated complaints, New Look replaced a portion of the pipe. (Id. ¶ 107.) The pipe, however, still leaks. (Id.)

When Manderson received the documents in the mail, she realized for the first time that her mortgage obligations had increased from about $70,000.00 to $80,000.00 and that New Look had received about $7,000.00 of the loan proceeds. (Id. ¶ 108.) When Manderson questioned Gold about the transaction he said he would refinance her in twelve months at a lower rate. (Id. ¶ 110.)

Subsequently, Sullivan gave Manderson a copy of the contract she had signed, which had been altered to show a contract amount of $7,000.00, not $1,000.00. (Id. ¶ 111.) When Manderson complained, Sullivan refused to refund the $6,000.00, but offered to do additional work on her house. (Id. ¶ 112-13.) Manderson refused the offer. (Id. ¶ 114.)

Shortly after March 13, 2000, Hartford assigned Manderson's loan to defendant Provident. (Id. ¶ 115.) Manderson has made monthly payments to Provident. (Id. ¶ 116.)

## Scheme to Defraud Barnas

On October 10, 2001, Barnas signed a contract with New Look for roof work and tuckpointing to be performed on her house, which she had inherited from her father. (Id. ¶¶ 117-19.) The contract did not set forth a price for the work. (Id. ¶ 119.)

The next day, Scott Chastain, a New Look employee, arrived at Barnas' house "to do the attic." (Id. ¶ 120.) Chastian said that the work cost $2,400.00, which Barnas paid. (Id.)

A few days later, Chastain returned to her house with another New Look employee, to waterproof and paint the basement. (Id. ¶ 121.) Chastain charged Barnas $3,650.00 for the work, which she paid. (Id. ¶ 122.)

Over the next few weeks, New Look employees came to Barnas' house to do other work. (Id. ¶ 123.) On November 1, 2001, Sullivan told Barnas that the work was complete and that she owed $4,000.00, which she paid. (Id. ¶ 123.)

At the end of that month, Sullivan demanded that she pay another $9,000.00 for the work New Look had performed. (Id. ¶ 125.) Though she protested, Barnas ultimately gave Sullivan the money. (Id.)

In return for the $19,050.00 Barnas paid, New Look patched her roof, partially installed some vinyl siding on her garage and back porch and did a little unworkmanlike tuckpointing. (Id. ¶ 126.)

On January 10, 2002, Chastain told Barnas that when her parents purchased the house they had borrowed $5,000.00, which she now had to repay. (Id. ¶ 127.) Though Barnas did not believe the story, she paid the money anyway. (Id. ¶ 128.)

On a number of occasions in March 2002, Sullivan or his associates appeared at Barnas' home and demanded more money from her. (Id. ¶ 129.) Barnas acceded to their demands and gave them checks totaling $26,591.50. (Id. ¶¶ 130-32.) All of these checks were made payable to Kyle Harvey, Sullivan's stepson. (Id. ¶¶ 130-33.)

On March 12, 2002, Sullivan had Barnas execute a $60,000.00 home improvement contract and a mortgage in the same amount. (Id. ¶ 134.) Sullivan did not give Barnas copies of any of the documents she had signed. (Id.)

On March 15, 2002, Barnas told her nephew Dan Czuba what had happened. (Id. ¶ 135.) Czuba told Sullivan to stay away from Barnas and to cancel whatever agreements she may have signed. (Id. ¶ 136.) Sullivan said the mortgage had not gone through because there was a cloud on the title. (Id. ¶ 137.)

Czuba and Barnas filed a complaint with the police about Sullivan. (Id. ¶ 138.) In response, Sullivan produced a number of documents purportedly signed by Barnas, including three home improvement contracts and a release. (Id.) Barnas' signature was forged on all of those documents. (Id. ¶ 139.)

In total, Sullivan received at least $50,000.00 from Barnas. (Id. ¶ 140.) New Look performed a maximum of $10,000.00 of work on her house. (Id.)

**RICO Allegations**

The RICO enterprise consists of "all persons and entities who were or are associated-in-fact in the marketing and financing of the home improvement contracts and loans generated by Sullivan and Gold on behalf of New Look and MDR and Hartford Financial." (Id. ¶ 142.) The enterprise identifies vulnerable homeowners and targets them for home improvement solicitations; generates home improvement contracts with no intent to perform; generates related loans to obtain the loan proceeds and fees; and assigns the loans on the secondary mortgage market to avoid the risk of nonpayment by borrowers who discover they have been the victims of a scam. (Id. ¶ 143.) The enterprise has an existence separate from the pattern of racketeering activity because New Look performs legitimate home improvement work, MDR provides legitimate mortgage brokerage services, Heritage Title provides legitimate real estate title services, and Equicredit, Bank One, Citizens, Fairbanks and Provident (collectively, "the bank defendants") provide legitimate mortgage lending services. (Id. ¶ 144.) The enterprise was directed by Sullivan "with the agreement and participation" of Gold, Alfaro-Giler, Heritage Title, Hartford Financial and others who are not parties to this suit. (Id. ¶ 147.) Citizens participated by "approving the fraudulent loan[], preparing loan documents, and authorizing Alfaro-Giler to act as [its] agent in closing the loan." (Id. ¶ 163.) Equicredit, Fairbanks, Bank One and Provident "knew or had constructive knowledge of the fraudulent nature of the loans, as a result of irregularities in the documentation, and/or failed to monitor and control the activities of their closing agent who directly participated in the fraud." (Id. ¶¶ 148, 168, 174e, 182, 185.) All defendants are alleged to have been "employed by or associated with the Enterprise" and to have "conducted and participated" in its affairs. (Id. ¶ 149.) Plaintiffs

allege that defendants carried out their scheme through repeated acts of mail and wire fraud.  (Id. ¶¶ 177-80.)

## The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor.  Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000).  No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## Discussion

It is not clear whether plaintiffs allege in Count I that the bank defendants committed a substantive RICO violation, are liable for conspiring to violate the statute, or both.  Accordingly, we must determine whether their complaint states either type of claim against any of these defendants.

## I. RICO – Substantive Violation

Among other things, RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To state a claim for a violation of §1962(c), plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Slaney v. International Amateur Athletic Fed'n, 244 F.3d 580, 597 (7th Cir. 2001).  The bank

defendants contend that plaintiffs have not adequately alleged any of these elements. We will start with the enterprise element.

## A. **Enterprise**

According to the statute, an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs contend that all of the defendants constitute an association in fact. (See Compl. ¶ 142.) To constitute an enterprise, however, an association in fact must "have an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making." Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000) (internal quotation marks and citation omitted).

The association plaintiffs allege is "directed" by John Sullivan, who identifies the victims and induces them to enter into home improvement contracts and mortgages. (Id. ¶¶ 147, 150, 154-59, 174a.) Sullivan then sends in Gold, a mortgage broker, who fills out loan applications for the victims. (Id. ¶¶ 160-61, 174b.) Subsequently, Sullivan, Gold and/or Alfaro-Giler induce the victims to execute documents that create mortgages in favor of Hartford or Citizens, institutions that Gold has convinced to accept the loans he generates, regardless of their legitimacy. (Id. ¶¶ 162-63, 174c-d.) Hartford and Citizens, in turn, assign the fraudulent mortgages to the other bank defendants, which accept the assignments though they know or should know that they are fraudulent. (Id. ¶¶ 168, 174d, e.)

Though the association plaintiffs allege has some structure, that structure does not extend to Bank One, Equicredit, Fairbanks or Provident. Sullivan heads the group and tells Gold and Alfaro-Giler whom to approach. Having secured their agreement to the fraudulent scheme, Gold tells Hartford and Citizens which loans to approve. But the alleged chain of command stops there. Though plaintiffs say that Bank One, Equicredit, Fairbanks and Provident "endorsed the actions and decisions and orders" of other association members by "agree[ing] to accept the fraudulently induced loans," (id. ¶¶ 149, 174e), they do not say what the parameters of those agreements were or with whom they were made.

Moreover, those details cannot be inferred from the complaint, which alleges an ever-changing cast of assignors and assignees and says nothing about why any assignee was selected for any given transaction or by whom. (See id. ¶ 43 (alleging that Bank One accepted assignment of the Pulphus loan from Citizens); id. ¶¶ 65, 83 (alleging that Equicredit accepted assignment of the Vanzant loans from Hartford); id. ¶ 84 (alleging that Fairbanks accepted assignment of the second Vanzant loan from Equicredit); id. ¶ 115 (alleging that Provident accepted assignment of the Manderson loan from Hartford).) The complaint does not allege an association with "a consensual decision making process whereby each of the defendants agreed to certain policies and procedures, and made group decisions regarding individual borrowers and transactions," as plaintiffs argue. (Pls.' Resp. at 17.) Rather, it describes a hierarchical organization run by Sullivan, whose fraudulent loans were randomly assigned to Equicredit, Provident, Fairbanks and Bank One. Because there are no allegations from which we can infer that Equicredit, Fairbanks, Bank One or Provident played some defined role in the hierarchical structure of the alleged association, plaintiffs have not alleged that they are a part of an "enterprise" within the meaning of § 1962(c).

Plaintiffs' allegations also do not support the inference that the alleged association continued over time. Plaintiffs say that the enterprise has been in operation for more than four years, (Compl. ¶¶ 176-78), but Equicredit is the only bank defendant who is alleged to have been involved in more than one transaction. (See id. ¶ 31 (alleging that Citizens originated the Pulphus loan); id. ¶ 43 (alleging that Bank One accepted assignment of the Pulphus loan from Citizens); id. ¶¶ 65, 83 (alleging that Equicredit accepted assignment of both Vanzant loans from Hartford Financial); id. ¶ 84 (alleging that Fairbanks accepted assignment of the second Vanzant loan from Equicredit); id. ¶ 115 (alleging that Provident accepted assignment of the Manderson loan from Hartford).) The bank defendants' sporadic involvement does not support the inference that all of the defendants are an ongoing group "associated through time," as a RICO enterprise must be. Stachon, 229 F.3d at 675.[1]

## B. **Conduct**

Another problem with any purported § 1962(c) claim against the bank defendants concerns the "conduct" element. The statute makes it unlawful for any person associated with an enterprise to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). According to the Supreme Court, a person participates in the conduct of an enterprise's affairs only if he plays "some part in directing those affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). Thus, a person does not violate §

---

[1] In their response, plaintiffs cite a number of other federal and state court suits filed against some of the defendants as support for the notion that the association has been in existence for years. (Pls.' Resp. at 9-10.) As far as we can tell, however, none of the bank defendants was a defendant in any of those suits. Thus, those lawsuits do not suggest that an enterprise involving the bank defendants has continued over time.

1962(c) if he merely participates in the affairs of an enterprise. Goren v. New Vision Int'l, Inc., 156 F.3d 721, 727 (7th Cir. 1998). He must "participate in the operation or management of the enterprise" to be liable. Id. A person need not be the head of the enterprise to participate in its operation, however. Rather, "a RICO enterprise may be operated . . . by . . . lower-rung participants in the enterprise who are under the direction of upper management." MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc., 62 F.3d 967, 977 (7th Cir. 1995) (internal quotation marks and citations omitted).

Plaintiffs say that the bank defendants participated in the operation of the enterprise through their agents, lower-rung participants who acted at Sullivan's direction. Specifically, plaintiffs say that: (1) Citizens conducted the affairs of the enterprise through its agent, Heritage Title; (2) Bank One conducted the affairs of the enterprise through its agent, Citizens; and (3) Equicredit and Provident conducted the affairs of the enterprise through their agent, Hartford. Plaintiffs say that Heritage Title was Citizens' agent because its employee, Alfaro-Giler, acted as the closing agent on the Pulphus loan, which originated with Citizens. (Pls.' Resp. at 17; Compl. ¶ 163.) Citizens is Bank One's agent, plaintiffs say, by virtue of a "pre-existing agreement" between the two lenders governing the assignment of loans originated by Citizens. (Pls.' Resp. at 17.) A similar agreement, plaintiffs claim, makes Hartford the agent of Equicredit and Provident. (Id. at 6-9, 17-18.)

According to Equicredit and Fairbanks, however, whether such agency relationships exist is immaterial because there is no vicarious RICO liability in this circuit. Our court of appeals suggested that was this case in D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964 (7th Cir. 1988). In the words of the court: "While the Seventh Circuit has not explicitly held that *respondent superior* is not applicable to RICO, vicarious liability is inconsistent with this court's approach to

- 14 -

direct RICO liability." Id. at 966. Just one year later, however, the court clarified that statement in Ashland Oil v. Barnett, 875 F.2d 1271 (7th Cir. 1989). Vicarious liability is the rule, not the exception, the Ashland Oil court said, and is suspended only when it "might be used to circumvent §1962(c)'s requirement that the person conducting the racketeering activities be separate from the enterprise through which those activities are conducted." Id. at 1281. Because the enterprise that the bank defendants, through their agents, allegedly operated is separate from the bank defendants themselves, the exception to vicarious liability does not apply.

We can infer from the complaint that Hartford and Citizens had agreements with Equicredit and Bank One, respectively, concerning the assignment of mortgages. (See Compl. ¶¶ 43, 65, 83 174d, e (alleging, generally, that Hartford and Citizens agreed to assign fraudulent loans to the other lender defendants, that the other lender defendants agreed to accept them, that Citizens assigned the Pulphus loan to Bank One and that Hartford assigned the Vanzant loans to Equicredit).) But plaintiffs do not allege that those agreements gave rise to agency relationships and, without more information about them, it is not reasonable to infer that they did. See Raclaw v. Fay, Conmy & Co., Ltd., 668 N.E.2d 114, 117 (Ill. App. Ct. 1996) (agency relationship exists if the principal actually authorized the agent to act on its behalf or took actions that would lead a reasonable person to assume the agent had such authority).

In their response, however, plaintiffs provide the missing information.[2] According to plaintiffs, Hartford agreed to act as the originator for among others, the Vanzant loans, which were immediately assigned to Equicredit. Hartford was the originator in name only, as Equicredit

---

We may consider the hypothetical facts proffered by plaintiffs, as Rule 9(b) does not apply to conduct allegations.

reviewed the documents, did the underwriting and approved the loan applications. By virtue of this agreement, plaintiffs say, Hartford was the agent through which Equicredit conducted the affairs of the enterprise. (See Pls.' Resp. at 6-8.) Similar agreements exist, plaintiffs say, between Hartford and Provident, and Citizens and Bank One. (Id. at 9, 17.) Given these hypothetical facts, we can infer that Citizens and Hartford were the agents through which Bank One, Equicredit and Provident conducted the affairs of the enterprise.

Plaintiffs have also sufficiently alleged that Citizens conducted the affairs of the enterprise through its agent, Heritage Title. Plaintiffs generally allege that Citizens authorized Alfaro-Giler to act as its closing agent for the Pulphus loan,[3] (Compl. ¶¶ 163-64, 174c), and that it "instructed, directed, and controlled the closing process." (Pls.' Resp. at 11.) Given those allegations, it is reasonable to infer that Citizens conducted the affairs of the enterprise through Alfaro-Giler and Heritage Title, lower-rung participants in the enterprise, who disbursed the proceeds of the loan at the direction of Sullivan, the head of the enterprise. See MCM Partners, 62 F.3d at 977.

Plaintiffs have not, however, adequately alleged the conduct element with respect to Fairbanks. Though plaintiffs allege that Fairbanks accepted assignment of the second Vanzant loan from Equicredit, (Compl. ¶ 84), they do not contend that Equicredit is Fairbanks' agent. In fact, they say the reverse is true, that Fairbanks acted as Equicredit's agent for the servicing of mortgages. (Pls.' Resp. at 8.) Because plaintiffs say that Fairbanks acted at Equicredit's direction, not the

---

[3]It does not appear that Alfaro-Giler prepared the loan documents or secured Pulphus' signature on them. (See Compl. ¶¶ 28, 160-62 (alleging that Gold prepared the paperwork for the loans, and that Alfaro-Giler played the role of Sullivan's daughter when she, Sullivan and Gold gave the mortgage documents to Pulphus).) Apparently, when plaintiffs say "closing the loan" they mean disbursing the loan proceeds, as they allege that Heritage Title did so on behalf of Citizens, presumably through Alfaro-Giler. (Id. ¶¶ 42, 162-64.)

reverse, Fairbanks could not have directed the affairs of the enterprise through Equicredit. Because plaintiffs have not alleged or hypothesized any connection between Fairbanks and any participant in the enterprise who is under the direction of its upper management, they have not alleged that it conducted the affairs of the enterprise.

## C. **Pattern**

### 1. **Predicate Acts - Particularity**

To be held liable under § 1962(c), each defendant must have engaged in a pattern of racketeering activity, evidenced by the commission of at least two predicate acts. Jennings v. Emry, 910 F.2d 1434, 1439 (7th Cir. 1990) (affirming dismissal of RICO claim because plaintiff failed "to allege on the part of any of the Appellees a continuous and related course of racketeering activity, a 'pattern' as defined by our prior opinions."); Banks v. Wolk, 918 F.2d 418, 421 (3rd Cir. 1990) ("We note that no defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern."). The bank defendants say that plaintiffs have failed to allege the predicate acts of mail and wire fraud with particularity as Rule 9(b) requires. The Court agrees. "[A] plaintiff alleging predicate acts of mail and wire fraud must . . . . allege the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Slaney, 244 F.3d at 599. Plaintiffs' allegations fall far short of that standard. With respect to mail fraud, they generally allege that:

> From approximately January 1, 1998 to the present, defendants and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing, and attempting to execute, the scheme and artifice to defraud, as more fully described above, and for obtaining money and property, did place and cause to

be placed in post offices and authorized depositories for mail matter, and did cause to be delivered by mail, according to the directions thereon, certain mail matter to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (Mail Fraud), including but not limited to loan checks and loan documents.

(Compl. ¶ 177.) Their general wire fraud allegations are nearly identical:

From approximately January 1, 1998 to the present, defendants and their co-conspirators and agents unlawfully, willfully and knowingly, and for purposes of executing, and attempting to execute, the scheme and artifice to defraud, as more fully described above, and for obtaining money and property, did make use of interstate wires, in violation of 18 U.S.C. § 1343 (Wire Fraud), including but not limited to sending and/or receiving loan proceeds through interstate wires and sending and/or receiving certain documents through interstate phone (fax) lines.

(Id. ¶ 178.) Neither set of allegations specifically identifies who sent what to whom, how or when.

Plaintiffs' specific allegations concerning the alleged acts of fraud by the bank defendants help a little, but not much. Plaintiffs allege that: (1) Citizens wired the Pulphus loan proceeds to Heritage Title (id. ¶ 42); (2) Citizens likely used faxes and phones to consummate the Pulphus transaction (id.); and (3) Equicredit likely wired payment to Hartford for the first Vanzant loan (id. ¶ 66). The first allegation, coupled with plaintiffs' allegation that Citizens knew the loan was fraudulent (id. ¶ 163, 174d ) and the reasonable inference that the wire transfer occurred sometime in late October or early November 1999 (see id. at ¶¶ 31-33), sufficiently alleges an act of wire fraud. However, the last two, which do not affirmatively allege that wire use occurred, let alone when or, in the case of Citizens, for what purpose, do not.

In short, plaintiffs have adequately alleged only one predicate act taken by one bank defendant, Citizens. The remainder of their predicate act allegations do not pass muster under Rule 9(b).

### 2. **Predicate Acts – Continuity**

Even if the predicate acts were sufficiently pled, the bank defendants say, they would not form the requisite pattern of racketeering activity. Predicate acts constitute a pattern of racketeering activity only if they "are related, *and* . . . they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). The continuity element is met if there is "a series of related predicates extending over a substantial period of time," called closed-ended continuity, or if the predicates "by [their] nature project[] into the future with a threat of repetition," as when they "are part of an ongoing entity's regular way of doing business," called open-ended continuity. Id. at 241-42. The bank defendants say that plaintiffs have alleged neither form of continuity.

### a. **Closed-ended Continuity**

Plaintiffs allege that Provident, Bank One and Fairbanks each accepted assignment of one loan and that Equicredit accepted assignment of two. (Compl. ¶¶ 43, 65, 83-84, 115.) Citizens, plaintiffs allege, originated one loan. (Id. ¶ 31.) Even if we assume that each bank defendant committed two or more acts of mail or wire fraud to consummate those transactions, it is reasonable to infer that the predicates took place over a period days or weeks not months or years. Moreover, each bank defendant's purported predicate acts were directed at a single victim and, with the exception of Equicredit, which is alleged to have been involved with both Vanzant loans, they related to a single transaction. "[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction" is not the closed-end continuity contemplated by § 1962(c). Tellis v. United States Fid. & Guar. Co., 826 F.2d 477, 478 (7th Cir. 1986).

### b. **Open-ended Continuity**

Plaintiffs can still satisfy the pattern requirement, however, if their allegations suggest that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." Northwestern, 429 U.S. at 242-43. Towards that end, plaintiffs allege that "[t]he assignee lender defendants . . . have . . . a . . . practice of making loans through brokers and/or accepting assignment of loans without regard for the broker's or originator's violations of statutes and/or misrepresentations," (Compl. ¶ 182), and that "Citizens Bank had an ongoing agreement with MDR and/or Eric Gold to accept loans without regard to whether they were generated through fraud on the borrowers," (id. ¶ 163). Those allegations suggest that, sometimes, the bank defendants carelessly or recklessly purchase or originate fraudulent loans. They do not, however, suggest that those defendants deliberately defraud their customers as a matter of course, using telecommunications lines and the mail to do so. Consequently, plaintiffs have not satisfied the pattern requirement of § 1962(c).

In short, to the extent plaintiffs attempted to state substantive RICO claims against the bank defendants, they were unsuccessful. Any such claims are, therefore, dismissed.

## II. **RICO Conspiracy**

Plaintiffs have also not stated any claims under § 1962(d), which prohibits conspiracy to violate RICO. To state a RICO conspiracy claim, plaintiffs must allege: "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of such enterprise through a pattern of racketeering activity; and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." Goren, 156 F.3d at

732. In the context of § 1962(d), a defendant agrees to participate in the affairs of an enterprise if he "knowingly agree[s] to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 967 (7th Cir. 2000).

As discussed above, plaintiffs have alleged that all of the bank defendants but Fairbanks conducted the affairs of the enterprise. Moreover, though Fairbanks did not, plaintiffs have alleged that it agreed to facilitate the activities of an operator by agreeing to accept fraudulent loans from Equicredit. Thus, plaintiffs have adequately alleged the first element of a RICO conspiracy claim against all of the bank defendants.

Plaintiffs have not, however, alleged that any of the bank defendants "agreed that someone would commit at least two predicate acts" to accomplish the goals of the enterprise, the second element of a RICO conspiracy claim. Goren, 156 F.3d at 732. Moreover, plaintiffs' failure to identify with any specificity the perpetrators, victims or subjects of the alleged acts of mail and wire fraud, precludes us from inferring that such agreements existed. As a result, plaintiffs have not stated a viable RICO conspiracy claim against any of the bank defendants.

## III. Truth In Lending Act

### A. Statute of Limitations

In Count II, Pulphus asserts TILA claims against Citizens and Bank One. In Count III, Vanzant asserts TILA claims against Equicredit and Fairbanks. In Count IV, Manderson asserts TILA claims against Provident.[4] In each count, plaintiffs seek damages and rescission of the loans.

The bank defendants contend that any claims for damages are barred by TILA's one-year statute of limitations. The Court agrees. TILA requires consumers to file damages claims "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The violations plaintiffs allege, failure to receive required disclosures and rescission notices, occurred at or before the transactions were consummated. The Pulphus loan documents were executed on October 22, 1999. (Compl. ¶ 187.) The documents for the first and second Vanzant loans were executed on January 12, 2001 and March 27, 2001, respectively. (Id. ¶¶ 196, 198.) The Manderson loan documents were executed on March 7, 2000. (Id. ¶ 206.) Plaintiffs did not file their complaint until August 14, 2002, more than one year after each of the alleged TILA violations occurred. Consequently, their TILA damage claims are time-barred.

Plaintiffs' claims for rescission, however, are subject to a different standard. The regulations give consumers three days from the delivery of the notice to rescind or delivery of all material disclosures, whichever occurs last, to rescind a transaction. 12 C.F.R. § 226.23(a)(3). If, however, the notice or material disclosures are not delivered, the consumer has three years from the date the transaction was consummated to rescind. Id. Material disclosures means "the disclosure . . . of the

---

[4]Vanzant also charges Hartford with TILA violations in Counts III and IV, but Hartford has not moved to dismiss these claims.

annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, [and] the due dates or periods of payments scheduled to repay the indebtedness." 15 U.S.C. 1602(u); see 12 C.F.R. § 226.23(a)(3) n.48.

Pulphus says she is entitled to the three-year rescission period because Citizens, by giving her two contradictory sets of disclosures, in essence gave her none. (Compl. ¶ 32; see Mem. Supp. Citizens & Bank One's Mot. Dismiss, Exs. 2 & 3, Pulphus Truth In Lending Disclosure Statements.[5]) Citizens says a TILA claim cannot be premised solely on the existence of two sets of disclosures because the regulations contemplate that multiple sets may be given.

In relevant part, the regulation to which Citizens refers states:

> Early disclosures. If disclosures required by this subpart are given before the date of consummation of a transaction and a subsequent event makes them inaccurate, the creditor shall disclose before consummation:
>> (1) any changed term unless the term was based on an estimate in accordance with § 226.17(c)(2) and was labeled an estimate;
>> (2) all changed terms, if the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed earlier by more than 1/8 of 1 percentage point in a regular transaction, or more than 1/4 of 1 percentage point in an irregular transaction, as defined in § 226.22(a).

12 C.F.R. § 226.17(f). Though one set of the disclosures appears to have been prepared before the loan closed and the other on the day of the closing, (see Compl. ¶ 189 (alleging that the loan closed on October 22, 1999); Mem. Supp. Citizens & Bank One's Mot. Dismiss, Ex. 2, Truth In Lending Statement dated October 22, 1999; id., Ex. 3, Truth In Lending Statement dated October 14, 1999),

---

[5]Because these documents are "referred to in the plaintiff's complaint and are central to her claim," we can consider them in connection with the bank defendants' motion to dismiss. Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993).

plaintiff alleges that they were both presented to her at the closing. (See Compl. ¶ 32; Mem. Supp. Citizens & Bank One's Mot. Dismiss, Exs. 2 & 3, Truth In Lending Disclosure Stmts. (both showing signature date of October 22, 1999).) Because plaintiff has alleged that she received two contradictory disclosure statements simultaneously, not successively, Citizens can take no refuge in the regulation governing the correction of early disclosures. Cf. Vance v. National Benefit Ass'n, No. 99 C 2627, 1999 WL 731764, at *3 (N.D. Ill. Aug. 30, 1999) (stating, in a loan splitting case, that "giving . . . two separate disclosure statements for a single loan transaction is a violation of TILA's requirement of a single, comprehensible disclosure of the cost of credit.") (internal quotation marks and citation omitted). In short, Pulphus' claim for rescission, which was filed within three years of the date the loan transaction was consummated, is timely.

Manderson's claim for rescission is timely as well. Though she apparently received all of the mortgage documents, (Compl. ¶¶ 98-101, 108), she also alleges that those documents did not contain the disclosures required by TILA. (Id. ¶ 209.) Thus, she had three years from the date the transaction was consummated, or until March 7, 2003, to seek rescission. Her claim is, therefore, timely.

Read liberally, Vanzant's allegations regarding her first loan also state a timely claim for rescission. Though she admits that she received copies of "some or all" of the documents for the first loan "a couple of weeks" after the transaction was consummated on January 12, 2001, (id. ¶¶ 56-58), she also says that copies of "many important documents" were withheld (id. ¶ 58). Because those allegations do not necessarily contradict her claim that she never received the required disclosures, her claim to rescind the first loan is timely.

Vanzant's claim for rescission of the second loan, however, is more complex. TILA requires lenders who make variable interest rate loans that are secured by a consumer's principal dwelling and have a term greater than one year to provide the consumer with two sets of disclosures. The first set must be given "at the time the application form is provided or before the consumer pays a non-refundable fee, whichever is earlier" and includes "[t]he booklet titled Consumer Handbook on Adjustable Rate Mortgages" and various other disclosures about how and when the rate will change. 12 C.F.R. § 226.19(b). The second set is given at the time of closing and consists of two statements: (1) "that the transaction includes a variable-rate feature"; and (2) "that variable-rate disclosures have been provided earlier." 12 C.F.R. § 226.18(f)(2). The Truth in Lending Statement Vanzant received in connection with the second loan contains the second set of disclosures. (See Equicredit's Mem. Supp. Mot. Dismiss, Ex. G.)[6] It does not, however, contain the first, which Vanzant alleges she never received. (See id.; Compl. ¶ 199.)

Though a violation of the statute, the alleged failure to provide the first set of disclosures, Equicredit says, does not toll the rescission period. The time to rescind begins to run on the day the transaction is consummated, the consumer receives the rescission notice or the consumer receives the material disclosures, whichever occurs last. 12 C.F.R. § 226.23(a)(3). Material disclosures include "the required disclosures of the annual percentage rate." 12 C.F.R. § 226.23(a)(3) n.48. The Federal Reserve Board ("the Board"), the agency charged with administering TILA, has interpreted that section to mean: "Failure to provide information regarding the annual percentage rate also includes failure to inform the consumer of *the existence* of a variable rate feature. Failure to give the other required disclosures does not prevent the running of the rescission period, although that

_____

[6] See n.5.

failure may result in civil liability or administrative sanctions." 12 C.F.R. Pt. 226, Supp. I, cmt. § 226.23 (emphasis added). Because the Truth in Lending Statement Vanzant received for the second loan informed her of the existence of the variable rate feature, Equicredit says her rescission claim is untimely.

The Court agrees. The plain meaning of the Board's commentary on 12 C.F.R. § 226.23(a)(3) is that only one variable rate disclosure violation -- a lender's failure to disclose the existence of a variable rate feature -- tolls the rescission period. A lender's failure to provide any of the other variable rate disclosures required by 12 C.F.R. §§ 226.18(f) and 226.19(b) may subject it to other sanctions, but it will not extend the rescission period granted to the consumer. According to the Supreme Court, "deference [to the Board] is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, [the Board's] staff opinions construing the Act or Regulation should be dispositive." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980). There is nothing irrational about the Board's desire to extend the period to rescind a loan, a rather Draconian remedy, only for those consumers who were completely unaware that their loan had a variable rate. Accordingly, we will adhere to the plain language of its interpretation and hold that the only variable rate disclosure that is material within the meaning of 12 C.F.R. § 226.223(a)(3) is the disclosure that a loan has a variable interest rate feature. Vanzant was told her second loan had a variable rate feature, and she does not allege any other basis for extending the rescission period. Therefore, her claim to rescind the second loan, which was filed nearly seventeen months after the transaction was consummated, is untimely. See generally Resolution Trust Corp. v. Martinez, No. C-3-93-429, 1994 WL 1631035 (S.D. Ohio Aug.

24, 1994) (deferring to Board's interpretation of 12 C.F.R. § 226.23(a)(3) and holding that lender is only required to disclose existence of variable rate feature to avoid extending rescission period).

## B. **Merits**

Even if they are timely, Citizens argues that Pulphus' rescission claims are without merit. We disagree. As discussed above, Pulphus' allegation that she received two, contradictory TILA disclosures simultaneously is equivalent to alleging that she received none, a paradigmatic violation of TILA.

Her claim that Citizens misled her about her rescission rights is also on solid ground. Though Pulphus' confirmation of her election not to rescind is dated three business days after the closing, she alleges that she actually signed it, at Citizens' agent's direction, on the day of the closing. (Compl. ¶ 33.) Pulphus, an elderly woman with a third-grade education, also alleges that she could not read or understand the documents she signed, which she thought were associated with the Weatherization Program, and felt she had to sign everything presented to her so defendants would replace the porch they had removed from her home. (Id. ¶¶ 28-30.) Taken together, those allegations state a claim against Citizens for failing to provide Pulphus with notice of her rescission rights. See Rodash v. AIB Mortgage Co., 16 F.3d 1146, 1156 (11th Cir. 1994) (lender that secured consumer's signature on election not to rescind on day of closing violated TILA because "proffering . . the Election not to Cancel during the transaction would confuse any reasonable borrower because it implies . . . that waiver is . . . possible during the three-day cooling off period" and "[would] suggest[] that [the consumer] had foreclosed her right of rescission." ), abrogated in part on other grounds, Veale v. Citibank, F.S.B., 85 F.3d 577 (11th Cir. 1996); Cf. Smith v. Cash Store Mgmt.,

Inc., 195 F.3d 325, 332 (7th Cir.1999) ("[W]hen a lender informs a borrower of his right to rescind, but also contradicts this notice by telling the borrower that he had waived his right to rescind, the borrower may state a claim under [TILA].") (Manion, J., concurring in part and dissenting in part).[7]

Provident and Bank One also argue that the rescission claims asserted against them must be dismissed because loans assigned to "innocent" assignees cannot be rescinded. In support of this argument they cite Coleman v. Equicredit Corp. of Am., No. 01 C 2130, 2002 WL 88750 (N.D. Ill. Jan. 22, 2002), in which the court said:

> Equicredit is an assignee of the original lender, Mortgage Capital. An assignee's liability under TILA depends on the terms of Section 1641. This section makes an assignee liable to an obligor only for those TILA violations that are apparent on the face of the documents it receives as part of the assignment. Equicredit received a fully filled out copy of the Notice of Right to Cancel which bore the acknowledgment of the Colemans acknowledging that the requirements of Section 1635 had been satisfied. . . . Therefore, Equicredit was entitled to rely on the documents it received which showed that Mortgage Capital had apparently complied with the requirements of Section 1635 and that the Colemans' right to rescind had long since expired.

Id. at *2.

We respectfully disagree with the Coleman court. According to section 1641(a), any civil action that can be brought against a creditor may be brought against an assignee as well, but only if the violation is apparent from the face of the loan documents. Section 1641(c), however, which is titled "Right of rescission by consumer unaffected," unequivocally states that assignees are not

---

Citizens argues that Rodash is of dubious value after the Eleventh Circuit's opinion in Smith v. Highland Bank, 108 F.3d 1325 (11th Cir. 1997). We disagree. Smith was a class action in which the plaintiffs claimed that a form containing both a rescission notice and a confirmation of election violated TILA. The Smith court distinguished Rodash and held that the notice was valid, but emphasized that "a court 'must scrutinize the circumstances of [each] transaction'" to determine whether the lender has complied with TILA's notice provision. Id. at 1327 (quoting Rodash, 16 F.3d at 1146). The alleged circumstances of the Pulphus transaction, like those in Rodash, suggest that Citizens did not comply with the statute.

exempt from claims for rescission: "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." Because the Coleman court's conclusion that "innocent" assignees are exempt from claims for rescission is in direct conflict with the unambiguous language of the statute, we decline to follow it.

Provident also contends that the rescission claim asserted against it must be dismissed because Manderson did not provide it with a notice of her election to rescind, as contemplated by the statute. According to the statute, a consumer must notify the lender of his intent to rescind, "in accordance with the regulations of the Board." 15 U.S.C. § 1635(a). The regulations direct a consumer "to notify the creditor of the rescission by mail, telegram or other means of written communication." 12 C.F.R. § 226.23(a)(2). Though the statute gives the lender twenty days after receiving a rescission notice to take steps to rescind the loan, 15 U.S.C. § 1635(b), neither the statute nor the regulations requires the consumer to send the notice twenty days before filing suit. Yet, Provident says that is what the statute means, and cites Jefferson v. Security Pac. Fin. Servs., 162 F.R.D. 123 (N.D. Ill. 1995) for support.

According to the Jefferson court: "Section 1635(b) requires the claimant to present a claim for rescission to the lender to give the lender twenty days to grant the request before a federal lawsuit is filed. The filing of a complaint initiates the lawsuit which Section 1635(b) is expressly intended to defer." Id. at 126. The Jefferson court cited no authority for that proposition and the statutory language does not support it. Though section 1635(b) gives the lender twenty days to rescind a loan after receiving a rescission notice, it does not prohibit the consumer from filing a lawsuit during that twenty-day period. In fact, that section says nothing about the timing of a lawsuit. Given the

statute's silence on the subject, the Jefferson court's conclusion that the rescission notice requirement is "expressly intended" to defer the filing of lawsuits is unpersuasive. Rather, we agree with the courts that have held that any written rescission notice, including a complaint, complies with the statute. See Taylor Domestic Remodeling, Inc., 97 F.3d 96, 100 (5th Cir. 1996) ("[T]he filing of the complaint constitutes statutory notice of rescission pursuant to 12 C.F.R. § 226.23(a)(3)."); Fairbanks Capital Corp. v. Jenkins, 225 F. Supp. 2d 910, 913-14 (N.D. Ill. 2002) ("Defendants allege that they have made a demand for rescission . . . and even if they had not done so, their filing of an affirmative defense and counterclaim seeking rescission would be sufficient to constitute a demand for rescission under the TILA.").

Moreover, even if the complaint did not constitute a rescission notice, we could dismiss Manderson's claim only if it were "[im]possible to imagine evidence consistent with the allegations of the complaint" that would entitle her to prevail. Walker v. National Recovery, Inc., 200 F.3d 500, 503 (7th Cir. 1999). In her brief, Manderson says that the complaint was the second rescission notification she gave Provident; the first was sent by mail six months before she filed suit. (See Pls.' Resp. at 44.) Because it is possible that Manderson sent Provident a rescission notification at least twenty days prior to filing her complaint, her rescission claim would not be dismissed even if a twenty-day notice period were the rule. In short, Provident's motion to dismiss Manderson's rescission claim is denied.

Equicredit has another string to its bow as well. It argues that the first Vanzant loan, which was extinguished by the second Vanzant loan, (Compl. ¶ 76), cannot be rescinded. That is the conclusion reached by the Ninth Circuit in King v. State of Cal., 784 F.2d 910, 913 (9th Cir. 1986), a case relied on by two judges in this district. See Coleman, 2002 WL 88750 at *2; Jenkins v.

Mercantile Mortgage Co., 231 F. Supp. 2d 737, 745-46 (N.D. Ill. 2002).[8] The King court, however, concluded that refinanced loans could not be rescinded without any analysis or citation to authority. In fact, it devoted only two sentences to the issue: "The loan of March 1981 cannot be rescinded, because there is nothing to rescind. King refinanced that loan in November 1981, and the deed of trust underlying the March 1981 loan has been superseded." Id. at 913.

The King court's conclusion, however, is at odds with TILA and its regulations. The regulations permit a consumer to rescind a transaction for which disclosures were never received within three years "after consummation, upon transfer of all of the consumer's interest in the property, [or] upon sale of the property, whichever occurs first." 12 C.F.R. § 226.23(a)(3). Conspicuously absent from that list is payment of the loan. It might make sense to read loan payment into the list if elimination of the security interest were the only effect of rescission. But it is not. According to the statute, a lender served with a notice of rescission must, in addition to voiding the security interest, return any money or property the consumer has given to it. 15 U.S.C. § 1635(b).[9] Because there is no statutory basis for concluding that loan payment terminates a consumer's right to rescind, Equicredit's motion to dismiss the claim to rescind the first Vanzant loan is denied.

---

[8] Equicredit also cites Mijo v. AVCO Fin. Servs. of Haw., 937 F.2d 613 (9th Cir. 1991), an unpublished opinion. According to Rule 36-3 of the Rules of the Ninth Circuit Court of Appeals, however, "[u]npublished dispositions and orders of [the] Court are not binding precedent, except when relevant under the doctrines of law of the case, res judicata, and collateral estoppel." Thus, Mijo does nothing to further Equicredit's cause.

[9] The lender's obligation to return the money paid to it is part of the rescission remedy governed by 15 U.S.C. § 1635(b), not a damages remedy governed by 15 U.S.C. § 1640.

## IV. Common Law Fraud

The bank defendants also move to dismiss the common law fraud claims plaintiffs assert against them. To state a claim for fraud, plaintiffs must allege either that: (1) defendants made a material statement of fact that they knew or believed was untrue, the statement was intended to induce plaintiffs to rely on it, plaintiffs justifiably relied on it and were damaged as a result, Sims v. Tezak, 694 N.E.2d 1015, 1019 (Ill. App. Ct. 1998); or (2) defendants "'accept[ed] the fruits of fraud knowing of the means by which they were obtained.'" Beaton & Assocs., Ltd. v. Joslyn Mfg. & Supply Co., 512 N.E.2d 1286, 1291 (Ill. App. Ct. 1987) (quoting Moore v. Pinkert, 171 N.E.2d 73, 77 (Ill. App. Ct. 1960)).

Plaintiffs allege that Citizens perpetrated fraud through Alfaro-Giler, its alleged agent. (See Compl. ¶¶ 215-216; supra at 16.) And, contrary to Citizens' belief, plaintiffs have adequately alleged a fraud claim against Alfaro-Giler. According to plaintiffs, Alfaro-Giler, together with Sullivan and Gold, "specifically and repeatedly" told Pulphus that the mortgage documents were "related to the 'Weatherization Program.'" (Compl. ¶ 28.) Alfaro-Giler allegedly made those misrepresentations to Pulphus at Pulphus' home on October 22, 1999, the day Pulphus executed the mortgage documents. (Id. ¶¶ 28, 187, 190-91.) It is reasonable to infer that Alfaro-Giler intended Pulphus to rely on those statements and that Pulphus justifiably did so given: (1) her previous involvement with the Weatherization Program (id. ¶ 22-23); (2) Sullivan's representation that he was associated with the Weatherization Program (id. ¶ 21); and (3) her age and education level (id. ¶ 4). Moreover, plaintiffs allege that, as a result of Alfaro-Giler's misrepresentations, Pulphus' home was encumbered with a $71,000.00 mortgage for which she received approximately $6,000.00 in home

repairs. (Id. ¶¶ 39, 41.) Those allegations adequately state a fraud claim against Alfaro-Giler, and her alleged principal, Citizens.

Plaintiffs contend that they have also stated viable fraud claims against Bank One, Provident, Equicredit, and Fairbanks because they have alleged that their respective agents committed fraud. As an initial matter, as discussed above, plaintiffs have not alleged that any of the defendants was Fairbanks' agent. Fairbanks cannot, therefore, be held liable for fraud on an agency theory.

Plaintiffs have hypothesized that Citizens was Bank One's agent, and Hartford was the agent of Provident and Equicredit, but they have not alleged that Citizens or Hartford made any material misstatements of fact to plaintiffs. Rather, they allege that Gold and Alfaro-Giler, the alleged agents of Citizens and Hartford, did so. The assignees can only be held liable for their agents' agents' fraud, however, if the assignees gave their agents the authority to involve other agents in the transactions. Though no such allegations appear in the complaint, plaintiffs say that was the case. (See Pls.' Resp. at 7 (hypothesizing that one of the terms in the agreements between Hartford and Equicredit, Hartford and Provident, and Citizens and Bank One is that the assignees "must specifically approve" their agents' use of other agents).) Thus, Pulphus' allegation of fraud against Alfaro-Giler, and her purported principal Citizens, also states a viable fraud claim against Citizen's purported principal, Bank One.[10]

---

[10]Alternatively, Bank One argues that its status as a holder in due course protects it from the fraud claims. Even if that is the effect of holder in due course status, it would not help Bank One because plaintiffs have alleged that the assignees were not holders in due course. See 810 ILL. COMP. STAT. 5/3-302 (holder in due course is one who takes negotiable instrument without notice of defenses), 5/1-201(25)(c) (a person has notice of defense if "from all the facts and circumstances known to him at the time in question he has reason to know that it exists."); (Compl. ¶ 168 (assignees should have known loans were fraudulent because of irregularities in the documents)).

The fraud claim against Provident, which accepted assignment of the Manderson loan, is viable as well. Manderson alleges that Gold falsely told her that she was applying for a loan, when she was executing mortgage documents, and that the loan would have a lower interest rate and monthly payments than her current mortgage. (Id. ¶¶ 91, 93-95, 102.) Moreover, given her allegations that: she is a sixty-nine year old, unsophisticated consumer who is unfamiliar with modern mortgage transactions, she believed the documents she signed were a loan application not a mortgage, and the documents had no numbers on them, (id. ¶¶ 6, 93-94), it is at least arguable that her reliance on Gold's statements was justified. See Sims, 694 N.E.2d at 1021 (stating that justifiable reliance is a fact question for the jury). Finally, Manderson alleges that the mortgage she unwittingly signed increased her overall mortgage obligation by $10,000.00, increased her monthly payments by $200.00 and only netted her $1,799.00 and the unworkmanlike repair of one pipe. (Compl. ¶¶ 88, 91, 97, 102, 107.) Taken together with the facts hypothesized by plaintiffs, those allegations state a claim for fraud against Gold and his ultimate principal, Provident.

Vanzant has not, however, stated a fraud claim against Equicredit. Though she alleges that a variety of misstatements were made to her in connection with her two loan transactions, she does not attribute any of them to Gold or Alfaro-Giler. (See id. ¶¶ 45-87.) Rather, she says Sullivan was the culprit. Because Vanzant has not alleged that Gold or Alfaro-Giler made false statements of material fact to her, she has not stated fraud claims against them or their purported principal, Equicredit.

In the alternative, plaintiffs say, Equicredit and Fairbanks can be held liable for accepting the fruits of others' fraudulent conduct. Equicredit and Fairbanks contend that they did not accept the fruits of any fraud because Vanzant was not the victim of actionable fraud. Rather, they claim

she is the victim of promissory fraud, fraud based upon false promises to perform future acts, which is not actionable in Illinois.

As a general rule, promissory fraud claims are actionable in Illinois only if they are part of a scheme to defraud. General Elec. Credit Auto Lease v. Jankuski, 532 N.E.2d 361, 364 (Ill. App. Ct. 1988). As our court of appeals has noted, however, "[t]he distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused . . . considerable uncertainty." Desnick v. American Broad. Cos., Inc., 44 F.3d 1345, 1354 (7th Cir. 1995). So elusive is the distinction, that many cases say the exception has become the rule. See, e.g., General Elec. Credit Auto Lease, 532 N.E.2d at 364 ("The distinguishing features of a 'scheme' . . . are not clear in Illinois case law, and the exception, therefore, seems to engulf the general rule . . . ."); Stamatakis Indus., Inc. v. King, 520 N.E.2d 770, 772-73 (Ill. App. Ct. 1987) (same). Until the Illinois Supreme Court so holds, however, federal courts can only entertain a promissory fraud claim if it is premised on a "scheme." Such a scheme exists if the promissory fraud "is particularly egregious" or if "it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." Desnick, 44 F.3d at 1354.

The conduct alleged by Vanzant meets that standard. She says that: (1) she is a seventy-three year old, unsophisticated consumer who owned a home in desperate need of repairs (Compl. ¶¶ 5, 45, 70); (2) she hired Sullivan's company to replace some windows and a door, which was done satisfactorily (id. ¶ 46); (3) a few months later, Sullivan told her he would remodel her whole house, but she would have to take out a $50,000.00 mortgage to finance the improvements (id. ¶¶ 47-49, 52-59); (4) more than $45,000.00 of the loan amount went to Sullivan, though he did little work on the house (id. ¶¶ 57, 60, 68 ); (5) when she complained, Sullivan told her she would have to "re-do"

the mortgage to have the work done, though he would make eight months of the payments himself to compensate for the delay (id. ¶ 69); (6) he then had her take out an $80,000.00 mortgage, nearly $30,000.00 of which he pocketed (id. ¶¶ 73, 76-78); (7) Sullivan did no further work on the house and, when Vanzant complained to the police, he produced contracts and releases, on which her signature had been forged, to refute her claims (id. ¶ 86). The facts as Vanzant alleges them are egregious and reveal a larger pattern of deceptions that reasonably induced her reliance. Thus, Vanzant has stated a viable fraud claim against Sullivan

To state a fruits of the fraud claim, plaintiffs must allege that Equicredit and Fairbanks "'accept[ed] the fruits of fraud knowing of the means by which they were obtained.'" Beaton & Assocs., Ltd., 512 N.E.2d at 1291 (quoting Moore, 171 N.E.2d at 77). The question is, what does "knowing" mean in this context? Does it mean only actual knowledge of fraud, as the defendants contend, or does it mean actual knowledge or wilful ignorance of fraud, as plaintiffs contend?

Though the Illinois Supreme Court has yet to address this question, we are persuaded that the court would agree with plaintiffs. The fruits of the fraud doctrine reflects a policy choice to hold those who passively participate in fraud as responsible as those who actually make the fraudulent representations. Liability for actively perpetrating fraud is not limited to those who have actual knowledge that the statements they made are false. Rather, liability can be imposed if the defendant made the statements with reckless disregard for their truth or falsity. Chabraja v. Avis Rent A Car Sys., Inc., 549 N.E.2d 872, 874 (Ill. App. Ct. 1989). Given the Illinois courts' decision to treat the perpetrators and the conscious beneficiaries of fraud identically, the same knowledge standard should apply to both. Thus, we hold that plaintiffs can state fruits of the fraud claims against Equicredit and

Fairbanks if they allege that those defendants deliberately ignored facts that suggested the loans were fraudulent.

Plaintiffs say their allegation that the assignees "knew or had constructive knowledge of the fraudulent nature of the loans, as a result of irregularities in the documentation," (Compl. ¶ 168), satisfies this standard. If fraud claims were subject to notice pleading standards, we would agree. But they are not. To pass muster, plaintiffs' fraud claims must comply with the heightened pleading standard of Rule 9(b), which requires them to identify specifically the "irregularities" that the Equicredit and Fairbanks allegedly ignored and why those irregularities should have alerted them to the fraud. Cf. Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992) (Rule 9(b) requires plaintiffs to allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to [them].") (internal quotation marks and citation omitted). Accordingly, Equicredit and Fairbanks' motion to dismiss the fraud claims asserted against them is granted.

## V. Illinois Consumer Fraud Act

In the last count of their complaint, plaintiffs allege that each of the bank defendants violated the Illinois Consumer Fraud and Deceptive Practices Act ("Consumer Fraud Act"). Among other things, that statute prohibits "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." 815 ILL. COMP. STAT. 505/2. The Act permits "[a]ny person

who suffers actual damage as a result of a violation of [the] Act committed by any other person [to] bring an action against such person." 815 ILL. COMP. STAT. 505/10a.

As discussed above, plaintiffs have adequately alleged that the agents of Citizens, Bank One and Provident misrepresented material facts in the course of securing the Pulphus and Manderson loans. Thus, plaintiffs have stated viable Consumer Fraud Act claims against those defendants.[11]

---

[11]In the alternative, plaintiffs argue that the Home Ownership and Equity Protection Act ("HOEPA") governs the Manderson mortgage and makes Provident liable on this claim. HOEPA applies to loans on which the points and fees paid by the homeowner exceed eight percent of the total loan amount and subjects assignees to "all claims . . . that the consumer could assert against the creditor of the mortgage." 15 U.S.C. §1641(d)(1).

It is not clear whether that provision makes assignees liable for the original lender's violations of state law or simply eliminates an assignee's holder in due course defenses to claims asserted against it for its own actions. Compare, e.g., Dash v. Firstplus Home Loan Trust 1996-2, No. 1:01 CV 00923, 2003 WL 1038355, at *10 (M.D.N.C. Mar. 6, 2003) ("By its terms, section 1641(d) . . . only affects . . . the 'holder in due course' defense, which a defendant assignee might raise against the holder of their loan.") with Bryant v. Mortgage Capital Res. Corp., 197 F. Supp. 2d 1357, 1364-65 (N.D. Ga. 2002) (holding that § 1641(d) imposes joint and several liability). The plain language of the statute and its legislative history, however, suggest that the former interpretation is correct.

By its terms, section1641(d) makes assignees "subject to all claims . . . that the consumer could assert against the creditor" and the legislative history of the provision suggests that it means just what it says. The Senate Report says that the provision subjects assignees "to all claims and defenses, whether under Truth In Lending or other law, that could be raised against the original lender" and "mirrors a rule promulgated by the Federal Trade Commission for 'consumer installment' loans." S. Rep. No. 103-69, at 28 (1994) reprinted in 1994 U.S.C.C.A.N. 1881, 1912. That FTC rule, called the holder rule, subjects holders of consumer credit contracts "to all claims and defenses which the debtor could assert against the seller of [the] goods or services." 16 C.F.R. § 433.2. The holder rule, the FTC explained, applies "'to all claims or defenses connected with the transaction, whether in tort or contract. When, under state law, a consumer would have a tort claim against the seller that would defeat a seller's right to further payments or allow the consumer to recover affirmatively, this claim is preserved against the holder.'" Simpson v. Anthony Auto Sales, Inc., 32 F. Supp. 2d 405, 410 (W.D. La. 1998) (quoting 41 Fed. Reg. 20023-24 (1976)). Given the language of the statute and Congress' stated intent to hold mortgage assignees to the same standard as holders of consumer credit contracts, we hold that section 1641(d) subjects assignees to suit for the mortgage creditor's violations of state law.

Plaintiffs have not, however, alleged that the Manderson loan was subject to HOEPA. Rather, their HOEPA argument is based entirely on a calculation of fees they attached to their response, a document that is not properly considered on a motion to dismiss. (See Pls.' Resp., Ex.

That leaves Equicredit and Fairbanks. To hold them liable under the Consumer Fraud Act, Vanzant must allege that they, directly or through their agents, actually committed violations of the Act. Zekman v. Direct Am. Marketers, Inc., 695 N.E.2d 853, 859 (Ill. 1998). "[K]nowingly receiving the benefits of another's fraud," the Illinois Supreme Court has said, is not actionable under the Consumer Fraud Act. Id.

Plaintiffs contend that Zekman "has nothing to do with assignee liability." (Pls.' Resp. at 36.) Rather, they say, the holding of Zekman is limited to cases in which a "plaintiff . . . cannot be made whole by the primary wrongdoer" and "seeks compensation from a secondary party who bears some kind of special relationship [to] the wrongdoer." (Id.) We disagree. The Zekman court did not limit its discussion to one specific context. On the contrary, the court framed the issue before it quite broadly, "whether knowingly receiving the benefits of another's fraud will support liability under [the Consumer Fraud Act]," and stated a holding of general application:

> [T]he plain language of section 2 of the Act does not include anything that makes it unlawful to knowingly receive the benefits of another's fraud. As this court stated in *Laughlin v. Evanston Hospital*, 133 Ill. 2d 374, 390, 140 Ill. Dec. 861, 550 N.E.2d 986 (1990), "[t]he language of the Act shows that its reach was to be limited to conduct that defrauds and deceives consumers or others." To allow plaintiff to recover for AT&T's knowingly receiving the benefits of Direct American's fraud would require us to read into the statute violations that are not part of the statutory text.

695 N.E.2d at 858-59. In short, there is nothing in the Zekman opinion that suggests mortgage assignees are exempt from its holding. Because Vanzant has not alleged that Equicredit or

---

G.) Moreover, the HUD-1 Settlement Statement for the Manderson loan suggests that the allowable HOEPA fees total $5759.00 or 7.8% of the total loan. See 12 C.F.R. § 226.4(c)(7)(i), (iii), (iv) (excluding reasonable title insurance, credit report and appraisal fees); (Pls.' Resp., Ex. B.) Because plaintiffs have not alleged that the Manderson loan was subject to HOEPA, it does not provide a basis for imposing Consumer Fraud Act liability on Provident.

Fairbanks, directly or though their agents, made material misstatements of fact to her, she has not stated viable Consumer Fraud Act claims against these defendants.

## Conclusion

For the reasons set forth above, the bank defendants' motions to dismiss are granted in part and denied in part, as follows: (1) the substantive RICO claims and the RICO conspiracy claims that plaintiffs assert against all of the bank defendants and the common law fraud and Consumer Fraud Act claims that they assert against Equicredit and Fairbanks are dismissed without prejudice; (2) the TILA damage claims that plaintiffs assert against all of the bank defendants and Vanzant's TILA claim against Equicredit for rescission of her second loan are dismissed with prejudice; and (3) the other TILA rescission claims, the common law fraud claims that plaintiffs assert against Citizens, Bank One and Provident, and the Consumer Fraud Act claims that they assert against Citizens, Bank One and Provident will stand. Plaintiffs have twenty-one days from the date of this Memorandum Opinion and Order to amend their complaint. Any claims not amended within that period will be dismissed with prejudice.

 **ENTER:**

                _____
                **UNITED STATES DISTRICT JUDGE**

**DATED:** _4-25-03_